IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **CALEB CHARLESTON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19-cv-764-DWD |
| | ) | |
| **ALEX JONES,** | ) | |
| **JOSHUA SCHOENBECK,** | ) | |
| **PAMELA WESTERMAN,** | ) | |
| **SARAH WOOLEY,** | ) | |
| **JOHN MCCALEB,** | ) | |
| **CHASE CARON,** | ) | |
| **JEFFREY GARDNER,** | ) | |
| **SHAUN GEE,** | ) | |
| **HEATHER MCGHEE, and** | ) | |
| **TANGELA OLIVER,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**DUGAN, District Judge:**

As narrowed by the Court's threshold order (Doc. 10), and the Court's rulings on Defendants' Motions for Summary Judgment concerning exhaustion (Doc. 71; Doc. 80), Plaintiff Caleb Charleston asserts an Eighth Amendment deliberate indifference claim against Defendants Jones, Westerman, Schoenbeck, Wooley, McCaleb, Caron, Gardiner, Gee and McGhee (the "IDOC Defendants"), and Defendant Oliver for failing to provide Plaintiff with adequate medical treatment after he was stabbed in his arm by another inmate on September 6, 2017.

Now before the Court are the Motions for Summary Judgment filed by Defendant Oliver (Doc. 106) and the IDOC Defendants (Doc. 109). On June 30, 2022, Plaintiff filed a

1

response to the motions (Doc. 117). For the reasons detailed below, the Motions will be granted.

## Undisputed Facts

Plaintiff has been an inmate of the Illinois Department of Corrections since 2013 (Doc. 107-2, p. 13). Plaintiff claims to suffer from nerve pain or damage in his right arm which started after Plaintiff was stabbed by another inmate at Menard Correctional Center on September 6, 2017 (Doc. 107-2, pp. 28, 30). At the time of his injury, Defendants held various positions at Menard: Jones was the assistant warden; Schoenbeck, Westerman, Wooley, McCaleb, Caron, Gardiner, and Gee were correctional officers; McGhee was a nurse; and Oliver was a mental health professional. Following his injury, Plaintiff interreacted with Defendants at various times until he was transferred to Pontiac Correctional Center on September 15, 2017 (Doc. 110-1). Sometime in 2018, Plaintiff was diagnosed with forearm neuropathy and prescribed Neurontin (Doc. 110-3, p. 117). On March 25, 2022, Plaintiff testified at his deposition that he continues to take Neurontin twice a day for his arm injury (Doc. 107-2, p. 9).

### *September 6, 2017*

On September 6, 2017, a fight involving approximately 30 inmates started in the prison yard at Menard (Doc. 110-2, pp. 29-30). During the fight, Plaintiff was attacked by an unidentified inmate who stabbed Plaintiff in his right arm (Doc. 110-2, p. 30). Plaintiff speculates that he was stabbed by "an ice pick type of shank or knife" (Doc. 110-2, p. 32). Plaintiff described the puncture wound as "small" (Doc. 110-2, pp. 62-63), or approximately a "finger-length deep" (Doc. 110-2, p. 32). Plaintiff's medical records

indicate that the wound was "1 to 2 millimeters" deep, with a "4-centimeter laceration." (Doc. 107-2, p. 40). In addition to the puncture wound, Plaintiff jammed his finger and had a swollen hand (Doc. 110-2, pp. 30-32).

Immediately after the fight started, correctional officers shot gunshots, so inmates got on the ground (Doc. 110-2, p. 34). Officers then directed inmates, including Plaintiff, to go to the yard gate to get handcuffed (Doc. 110-2, p. 34). Plaintiff informed Assistant Warden Jones, and Correctional Officers Schoenbeck and Westerman, that he needed medical attention, but they did not respond "productive[ly]" (Doc. 110-2, pp. 35-36). Instead, Plaintiff was instructed to go to the gate where he was handcuffed, and Officer Westerman escorted Plaintiff to the health care unit where he was seen by Nurse McGhee and Correctional Officer Wooley (Doc. 110-2, pp. 36-37). Plaintiff described the health care unit as busy or "a revolving door" because of the fight (Doc. 110-2, p. 68).

Plaintiff told Nurse McGhee that he could not move his arm, that it was bleeding and in pain, and he thought something was stuck in there (Doc. 110-2, p. 37). Plaintiff also explained that he felt dizzy and lightheaded, and his finger was jammed and swollen (*Id.*). McGhee observed that Plaintiff's middle finger had a limited range of motion (Doc. 110-2, p. 40). She then cleaned his puncture wound, applied ointment and a bandage (Doc. 110-2, pp. 38-40). McGhee also administered a tetanus shot (Doc. 110-2, p. 38). Plaintiff recalls that "after a nice amount of time" blood continued to flow down his arm, so he asked McGhee for additional bandages or treatment (Doc. 110-2, p. 38). However, McGhee replied that "[t]here is no doctor here. There is nothing else I can do." (Doc. 110-2, p. 38). The medical note from Plaintiff's encounter with McGhee indicates that Plaintiff

was referred to a medical doctor to follow up for his puncture wound and to check his middle finger (Doc. 110-2, pp. 40-41; Doc. 1-1, p. 30). McGhee also recommended that Plaintiff follow up with care for any additional issues (*Id.*).

Correctional Officer Wooley was at the health care unit the entire time Plaintiff was treated by Nurse McGhee. Plaintiff told Wooley that he was still bleeding, could not move his arm, and needed further medical treatment (Doc. 110-2, pp. 41-42). However, Wooley said she could not do anything, and instead took pictures of Plaintiff's injuries and bloody clothes (Doc. 110-2, p. 42).

After leaving the health care unit, Plaintiff was taken to the segregation building and did not see anyone until approximately an hour later when Correctional Officer Gardiner took Plaintiff to an interview room (Doc. 110-2, pp. 42-44). Plaintiff told Gardiner that his arm was in pain, and he needed medical treatment, but Gardiner stated that he had to complete the interview (Doc. 110-2, p. 44). After the interview, Plaintiff returned to his cell (Doc. 110-2, p. 45).

Plaintiff was then taken to see Defendant Oliver, a mental health professional, for a segregation assessment (Doc. 110-2, p. 46). Plaintiff's encounter with Defendant Oliver lasted approximately 10 minutes (Doc. 107-2, pp. 69-70). Plaintiff recalls that he was handcuffed with his arms behind his back the encounter, but that his bandage and blood were visible (Doc. 107-2, pp. 69-71). Defendant Oliver asked Plaintiff questions about his mental health (Doc. 107-2, p. 71). Plaintiff asked Oliver for medical treatment, but she did not provide it (Doc. 107-2, p. 72). Plaintiff testified that he did not know if Oliver was

qualified to provide him with medical treatment for his injury (Doc. 107-2, p. 72). After seeing Defendant Oliver, Plaintiff was escorted back to his cell.

After returning to his cell, Plaintiff believes he asked Correctional Officers McCaleb and Caron for medical attention two or three times on September 6th, but they stated something to the effect of "there is nothing they can do." (Doc. 107-2, pp. 48-50).

### *September 7, 2017 to September 15, 2017*

Plaintiff's wound started to scab overnight into September 7, 2017 (Doc. 110-2, p. 50). Plaintiff testified that the scab would come off when he moved his arm, and that this continued for "some days." (Doc. 110-2, p. 50). After about a week, Plaintiff testified that the scab fully formed and he no longer worried about bleeding (Doc. 110-2, p. 62). However, he did not regain full movement in his arm for a couple of months after the injury (Doc. 110-2, pp. 62-63). Plaintiff's wound never became infected (Doc. 110-2, p. 62). When describing the healing process, Plaintiff stated that the wound "looked good on the outside, but probably on the inside, it still wasn't healed up right" (Doc. 110-2, p. 63). Plaintiff believes that Menard "didn't take the stab wound so serious because of how small the puncture wound was" and because it appeared to be healed and was "small" and "only a little scab" (Doc. 110-2, pp. 62-63). Plaintiff speculates that Menard officials did not take into consideration the inside of the wound or "how deep the icepick … went in" (Doc. 110-2, pp. 62-63).

Plaintiff does not recall requesting any medical treatment from staff members on September 7, 2017 (Doc. 107-2, p. 49), although he testified that other inmates tried to

request care on his behalf, and he tried to speak to different nurses who walked through segregation (Doc. 107-2, pp. 52-56).

On September 10, 2017, Plaintiff was interviewed by Defendants Gee and Wooley about the September 6th fight (Doc. 110-2, p. 56). Plaintiff recalls asking Gee and Wooley for medical treatment because he could not move his arm, and it would still bleed when he moved it, but they ignored his request and continued asking Plaintiff questions about the fight (*Id.*).

In the days following his injury, Plaintiff claims he continued to request medical treatment from unidentified nurses and correctional officers but was ignored (Doc. 110-2, pp. 53-56). Plaintiff estimates that he might have seen Correctional Officers McCaleb and Caron about twice a day following his injury until his transfer on September 15, 2017, but could not recall specific dates (Doc. 110-2, p. 48-49). Plaintiff did not submit any requests for "sick-call", did not see a counselor, and did not submit grievances while at Menard (*See generally*, Doc. 110-2, pp. 53-59). Plaintiff testified that he did not have any paper to write a sick-call, and unnamed correctional officers refused to provide it because he was in lockdown (Doc. 110-2, pp. 59-60).

Plaintiff transferred to Pontiac Correctional Center on September 15, 2017, nine days after his injury (Doc. 110-1).

### *Events After September 15, 2017*

Once at Pontiac, Plaintiff began receiving treatment for his arm (Doc. 107-1, p. 3; Doc. 110-3, p. 77). This treatment included pain medication (Doc. 110-3, p. 77). On October 5, 2017, Plaintiff represented that his wound area was "perfectly healed" but that

6

he had not been exercising because he wanted his arm to heal (Doc. 107-1, p. 2; Doc. 1-1, p. 45). Plaintiff was prescribed Motrin for his pain and advised to start exercising (Doc. 107-1, p. 3; Doc. 110-3, p. 77; Doc. 1-1, p. 45). Plaintiff's medical records indicate that he consistently complained about his right arm pain over the next few months, although it was not always his chief complaint (*See, generally* Doc. 110-3; Doc. 1-1).

In March 2018, Plaintiff transferred to Stateville Correctional Center (Doc. 107-2, p. 79). While at Stateville, an x-ray was taken of his arm (Doc. 110-3, p. 98) and the results came back as normal (Doc. 110-3, p. 41; Doc. 1-3, p. 36). Plaintiff also underwent physical therapy at Stateville and was prescribed nerve pain medication for right arm neuropathy (Doc. 110-3, p. 117; Doc. 1-3, p. 55). On March 25, 2022, Plaintiff testified that he continues to take Neurontin twice a day for his arm injury (Doc. 107-2, p. 9). Plaintiff also testified that he had no problems with his arm "prior to being stabbed" (Doc. 110-2, p. 65).

## **Legal Standard**

Summary judgment is proper if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to, and draw all reasonable inferences

in favor of, the non-moving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

## Discussion

The Eighth Amendment's proscription against cruel and unusual punishment imposes an obligation on states "to provide adequate medical care to incarcerated individuals." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1072 (7th Cir. 2012) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials violate this proscription when they act with deliberate indifference to the serious medical needs of an inmate." *Holloway*, 700 F.3d at 1072 (citations omitted). To succeed on a deliberate indifferent claim, Plaintiff must establish that he "suffered from '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (citing *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)).

Plaintiff argues that all Defendants were deliberately indifferent to his serious medical needs by failing to provide him with adequate medical treatment or delaying his treatment immediately following his stabbing on September 6, 2017 until his transfer from Menard on September 15, 2017. The IDOC Defendants concede that Plaintiff's puncture wound following the September 6th fight was an objectively serious medical condition (Doc. 110, p. 11), and the Court agrees at this stage.[1] Thus, only the subjective component is at issue here.

---

[1] Defendant Oliver argues that the small size of the wound made it such that no person would perceive the need for a doctor's attention. However, Plaintiff's medical records indicate that he had a stab wound that required treatment. Moreover, a reasonable lay person might perceive that a bleeding puncture wound

To establish the subjective component, Plaintiff must show that each Defendant "knew of facts from which he could infer that a substantial risk of serious harm existed, and that he did, in fact, draw that inference." *Walker*, 940 F.3d at 964 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). This standard "requires more than negligence and it approaches intentional wrongdoing." *Holloway*, 700 F.3d at 1073; *accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("Deliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence does not violate the Constitution."). In determining whether an inmate's care evidences deliberate indifference, courts "must examine the totality of an inmate's medical care." *See Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 591 (7th Cir. 1999) (citing *Gutierrez v. Peters*, 111 F.3d 1364, 1374–75 (7th Cir. 1997) (isolated incidents of neglect during an otherwise continuous stretch of adequate medical care is insufficient to support an inference of deliberate indifference)).

"In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007). In other words, "a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Id.* Certainly, expert testimony would constitute acceptable medical

---

from an unknown object would mandate care. Thus, the undisputed material facts suggest that Plaintiff suffered from an objectively serious medical condition. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)* ("An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention.").

9

evidence, but that is not the only form of verifiable medical evidence that a plaintiff can use to get past summary judgment on a case like this. *See Williams*, 491 F.3d at 715 (finding the plaintiff offered sufficient medical evidence to satisfy the objective prong through the use of medical records and plaintiff's own testimony about his symptoms, care, treatment, and injuries). In delayed treatment cases, the Seventh Circuit has stated:

> No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury. For there is no tort—common law, statutory, or constitutional—without an injury, actual or at least probabilistic.

*Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013).

Plaintiff testified that he continues to take nerve pain medication for his right arm neuropathy resulting from the stabbing (Doc. 107-2, p. 9). However, Plaintiff has not presented evidence that this ongoing neuropathy or pain resulted from anything but the physical stabbing. In examining the totality of Plaintiff's medical care, the undisputed evidence in the record shows that Plaintiff received medical treatment for his puncture wound almost immediately following the stabbing on September 6th. Nurse McGhee cleaned Plaintiff's puncture wound, applied ointment and a bandage. She also administered a tetanus shot, recommended follow up treatment for Plaintiff's injuries, and referred him to a medical doctor. The wound began healing overnight, with a scab forming on September 7th. Plaintiff's testimony then confirms that the puncture wound was small and appeared to be healing properly "on the outside." (*See* Doc. 110-2, pp. 50, 62-63).

Plaintiff did not receive additional treatment at Menard but was transferred to Pontiac nine-days after his injury. Once at Pontiac, Plaintiff described the wound as "perfectly healed" and began treatment for the unresolved pain he continued to experience (Doc. 107-1, p. 3). In the months that followed, Plaintiff continued to complain about his arm pain and underwent additional medical treatment, including a diagnostic x-ray and physical therapy. Ultimately, he was diagnosed with neuropathy and began taking nerve pain medication (Doc. 110-3, pp. 41, 117; Doc. 1-3, pp. 36, 55).

In short, Plaintiff has failed to present evidence of any harm allegedly caused by Defendants' treatment, lack of treatment, or delay in treatment from September 6, 2017 until his transfer from Menard on September 15, 2017. It was only with the benefit of hindsight in the days and weeks following his injury that Plaintiff began to suspect that his puncture wound might not have healed properly "on the inside" leading him to request additional medical treatment at Pontiac and Stateville (*See* Doc. 110-2, p. 63). Thus, there is no verifiable evidence connecting any alleged deficient treatment or delay in treatment allegedly caused by Defendants to the long-term consequences or harm Plaintiff suffers now because of the *stabbing*. *See, e.g., Jackson*, 733 F.3d at 790 (some verifiable medical evidence is required to determine "whether the withholding of treatment during a brief period in the early stages of the conditions in an otherwise healthy man … was likely to cause serious, or indeed any, harm"); *Gutierrez*, 111 F.3d at 1374 (finding that plaintiff could not survive summary judgment when officials delayed treating a mild cyst infection for six days); *Martin v. Tyson*, 845 F.2d 1451, 1458 (7th Cir. 1988) (rejecting Eighth Amendment claim for delay in treatment, in part, because prisoner

failed to produce any evidence of injury caused by the delay); *Stevens v. Bukowski*, No. 15-2177, 2017 WL 1088079, at *5 (C.D. Ill. Mar. 22, 2017) ("[S]hort delays in receiving medical treatment, standing alone, are not sufficient to show deliberate indifference.") (citing *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015)); *LaBrec v. Syed*, No. 19-CV-804-JDP, 2021 WL 4206690, at *9 (W.D. Wis. Sept. 16, 2021) (finding that a failure to timely schedule a follow-up appointment after surgery for additional x-rays was not deliberate indifference when no evidence indicated that the delay caused a complication). Because Plaintiff has offered no verifying medical evidence that any alleged delay in his care, opposed to the actual stabbing he suffered, harmed him, Defendants are entitled to summary judgment.

Moreover, there is no evidence to suggest that Defendants acted with a sufficiently culpable state of mind. *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) ("to be deliberately indifferent, the defendants must have acted with 'a sufficiently culpable state of mind.'") (citation omitted). Applying this standard to medical officials, to be held liable under the deliberate indifference standard, he or she must respond in a way that is "so plainly inappropriate" or make a decision that is "such a substantial departure from accepted professional judgment, practice, or standards," that it gives rise to the inference that they intentionally or recklessly disregarded the prisoner's needs. *Holloway*, 700 F.3d at 1073; *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). In other words, a prison medical professional is "entitled to deference in treatment decisions unless no minimally competent professional would

12

have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (citation omitted).

Here, Nurse McGhee and Mental Health Professional Oliver are members of the medical staff. Nurse McGhee treated Plaintiff's wound, administered a tetanus shot, and referred him to a medical doctor almost immediately after his injury on September 6th. Defendant Oliver saw Plaintiff for a mental health evaluation a few hours after he was treated by Nurse McGhee. Plaintiff's encounter with Defendant Oliver lasted approximately 10-minutes, and Oliver cleared him for segregation (Doc. 107-2, pp. 69-70). Although Plaintiff argues that he needed additional bandages for his wound, or some other unidentified treatment, a "[d]isagreement between a prisoner and his doctor, or even two medical providers, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (the mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient to establish deliberate indifference).

Further, an inmate "is not entitled to demand specific care," nor is he "entitled to the best care." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) (a prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm" — not to demand specific care, or even to receive "the best care possible."). Thus, even though Plaintiff may have suggested additional measures to treat his puncture wound, he has presented no evidence that a "minimally competent professional would have [recommended those additional measures] under those circumstances." *Pyles*, 771 F.3d at 409. "To infer

deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment," *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006), but there is no such evidence here.

As for the non-medical officials, they will generally be justified in believing the prisoner is in capable hands. *Hayes*, 546 F.3d at 526–527; *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005). A non-medical defendant cannot be held "deliberately indifferent simply because he failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Johnson*, 433 F.3d at 1012 (internal citations and markings omitted); *Bond v. Aguinaldo*, 228 F. Supp. 2d 918, 920 (N.D. Ill. 2002) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.").

Here, Plaintiff claims to have complained to non-medical staff members, Defendants Jones, Westerman, Schoenbeck, Wooley, Gee, Gardiner, McCaleb, and Caron about his injury at various times from September 6, 2017 until his transfer on September 15, 2017. Plaintiff complained to Defendants Jones, Westerman, and Schoenbeck about his injury almost immediately after the fight ended on September 6, 2017. At that time, Jones, Westerman, and Shoenbeck were instructing those involved with the fight to go to the yard gate to be handcuffed. Thus, when Plaintiff complained of his injuries, Jones instructed Plaintiff to go to the gate, where he was then handcuffed and escorted to medical by Westerman. The undisputed facts do not show that Jones, Schoenbeck, or

Westerman ignored Plaintiff's complaints for care, delayed his care, or had any reason to believe that the prison medical doctors or assistants would not treat him. Accordingly, under these facts, no reasonable jury could conclude that Jones, Schoenbeck, or Westerman were deliberately indifferent.

Plaintiff also encountered Defendants Wooley and Gardiner on September 6th. Defendant Wooley was present with Plaintiff while he was evaluated by Nurse McGhee after the fight. Plaintiff claims that he told Wooley that he needed additional medical care while he was being treated by Nurse McGhee or immediately thereafter. However, non-medical officials, like Wooley, may defer to the judgment of the medical professionals. *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). Plaintiff has not presented any evidence to show that Wooley had reason to believe that Nurse McGhee's assessment was resulting in mistreatment, and thus, Wooley was entitled to rely on the assessment. *See Hayes*, 546 F.3d at 527 (nonmedical officials act with deliberate indifference "where they have 'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'") (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). Thus, Plaintiff cannot show that Wooley acted with deliberate indifference on September 6, 2017.

Similarly, Defendant Gardiner interviewed Plaintiff approximately two hours after the fight on September 6, 2017, and after Plaintiff had received medical treatment from Nurse McGhee. Plaintiff complains that he told Gardiner that he needed medical treatment, however, Gardiner did not do anything. Just as with Defendant Wooley, no reasonable jury could find that Defendant Gardiner was deliberately indifferent to

15

Plaintiff's medical needs. Gardiner was entitled to defer to the judgment of the medical professional who had evaluated him a few hours before the interview, and nothing in the record suggests that Gardiner had a reason to believe that prison doctors or their assistants were mistreating or not treating him. *See Hayes*, 546 F.3d at 527. Moreover, the "mere negligence in failing to detect and prevent subordinates' misconduct is not sufficient" to establish a deliberate indifference claim. *See, Arnett*, 658 F.3d at 756. Instead, Plaintiff "must demonstrate that 'the communication, in its content and manner or transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety.'" *Id.* There is no evidence in the record that Gardiner had reason to believe that Plaintiff's injury was not being treated or that it posed "an excessive risk" to Plaintiff's health or safety. Thus, Plaintiff cannot show that he acted with deliberate indifference on September 6, 2017.

Defendant Wooley also saw Plaintiff on September 10, 2017, this time with Defendant Gee. Plaintiff claims that he told Wooley and Gee that he could not move his arm without it bleeding, but they ignored his request for additional medical care. The undisputed facts show that Plaintiff's injury was small and had started to heal before his interaction with Wooley and Gee. Thus, although Plaintiff believes he asked Wooley and Gee for medical treatment and was refused, this is not enough to show deliberate indifference. Instead, Defendants must have had "actual knowledge" of Plaintiff's injuries so to infer that he required medical attention. *See Troutwine v. Kuhse*, No. 16 C 50251, 2019 WL 1227833, at *4 (N.D. Ill. Mar. 15, 2019) (citing *Haley v. Feinerman*, 168 F. App'x 113, 117 (7th Cir. 2006), *Farmer*, 511 U.S. at 837). Nothing in the record suggests

that Wooley or Gee had reason to believe that Plaintiff's injury on September 10th required medical attention or posed an excessive risk to his health or safety, *see, Arnett*, 658 F.3d at 756, particularly in light in Plaintiff's concessions that the wound was small, had begun healing, was not infected, and "looked good on the outside." Doc. 110-2, pp. 62-63). Thus, Plaintiff cannot show that Wooley or Gee were delibaretly indifferent on September 10, 2017.

Finally, Defendants McCaleb and Caron were correctional officers in Plaintiff's segregation unit. Plaintiff claims to have told Defendant McCaleb and Caron "multiple times" about his need for medical care while he was in the segregation unit, both on September 6, 2017 and the days thereafter, but they told him "there was nothing they can do." (Doc. 107-2, pp. 48-50). Plaintiff offers few details on his communications with McCaleb and Caron. Thus, even crediting Plaintiff's representation of these communications as true, Plaintiff has not demonstrated that his communications, either by their content or manner of transmission, gave McCaleb and Caron "sufficient notice to alert [them] to 'an excessive risk to inmate health or safety.'" *See, Arnett*, 658 F.3d at 756. Instead, the undisputed facts show that before his encounters with McCaleb and Caron, Plaintiff had either just been evaluated and treated by Nurse McGhee on September 6th, or his injury had started to heal "on the outside" in the days following. Thus, there is no indication in the record that McCaleb or Caron had reason to believe that Plaintiff's injury was not being treated or that it posed "an excessive risk" to Plaintiff's health or safety. Thus, no reasonable jury could find that McCaleb and Caron

17

were deliberately indifferent to Plaintiff's injuries on September 6, 2017 or until his transfer on September 15, 2017.

In sum, no reasonable jury could conclude that any of the Defendants acted with deliberate indifference in responding to Plaintiff's injury or complaints in the nine-days following his injury before he transferred from Menard. Accordingly, Defendants are entitled to summary judgment. Because the Court has reached a decision in Defendants' favor on the merits of Plaintiff's claims and concluded that the evidence does not create a genuine issue of material fact as to whether the Defendants violated Plaintiff's Eighth Amendment rights, the Court declines to reach the IDOC Defendants' qualified immunity argument.

## Disposition

For these reasons, Plaintiff has not demonstrated a genuine issue of material fact regarding the subjective prong of the deliberate indifference test. Defendants' Motions for Summary Judgment (Doc. 106; Doc. 109) are therefore **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff, and to close this case.

**SO ORDERED.**

Dated: September 8, 2022

_____
DAVID W. DUGAN
United States District Judge